DOCTORS HOSPITAL et al., Appellees,

v.

HAZELBAKER, Appellant, et al.*

[Cite as *Doctors Hosp. v. Hazelbaker* (1995), 106 Ohio App.3d 305.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 94APE11–1665.

Decided Sept. 29, 1995.

---

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (1996), 75 Ohio St.3d 1411, 661 N.E.2d 759.

*Baker & Hostetler, Robert M. Kincaid, Jr.* and *David C. Levine,* for appellee Doctors Hospital.

*Emens, Kegler, Brown, Hill & Ritter, Thomas W. Hill, Melvin Weinstein* and *Christopher Weber,* for appellant.

DESHLER, Judge.

Defendant-appellant, Ralph E. Hazelbaker, appeals from a judgment of the Franklin County Court of Common Pleas granting partial summary judgment in favor of plaintiffs-appellees, Doctors Hospital and Dennison Health Ventures, Inc. (collectively, "Doctors").

Hazelbaker is an experienced developer and operator of nursing homes in Ohio and elsewhere. Paradigm Corporation ("Paradigm") is his family-owned corporation. In December 1985, Hazelbaker obtained a certificate of need ("CON") from the Ohio Department of Health to develop a one-hundred-bed nursing home in the Dublin, Ohio area. A condition of the CON was that the developer also provide facilities for one hundred fifty "alternate care beds," which Hazelbaker proposed to satisfy by building a separate one-hundred-fifty-unit retirement center. Doctors initially approached Hazelbaker for the purpose of purchasing the CON from him outright. Hazelbaker declined to sell, but the parties instead discussed Doctors' participation in the development through a joint venture enterprise. For Hazelbaker, the attractive feature of Doctors' participation appears to have been the hospital's ability to provide "credit enhancement," in the form of guarantees of loans for the nursing home and retirement center projects.

The projected cost for the nursing home project was approximately $5.25 million, while the retirement center project was projected to cost approximately

$9 million. The CON required construction to begin by December 23, 1987; failure to break ground by the expiration date of the CON would have resulted in the loss for Hazelbaker of the CON, and the considerable investment in legal fees and other costs which it represented.

At this point the facts become somewhat subject to dispute. For purposes of reviewing summary judgment, we shall present the factual premises as set forth in Hazelbaker's affidavit presented with his memorandum contra summary judgment in the trial court.

Hazelbaker viewed the retirement center project as more costly and riskier than the nursing home project, making adequate credit enhancements particularly important to the financial success of the retirement center project. According to his affidavit, the result of Hazelbaker's discussions with Doctors was that Doctors would "provide up to $2.5 million in credit enhancements on the nursing home project, and, if it chose [to] participate in the retirement center project, Doctors would provide an additional $4.5 million of credit enhancements for a total of $7 million in credit enhancements." This allocation of credit enhancements between the retirement center project and nursing home project would be reflected in the fees paid to compensate Doctors for the credit enhancements, in the amount of $250,000 for the $2.5 million in guarantees on the nursing home project, and $500,000 for the $4.5 million in guarantees on the retirement center project.

Hazelbaker further asserts in his affidavit that he allowed Doctors to take the lead in securing financing for the nursing home project, and Hazelbaker informed Doctors that he relied upon Doctors to secure such financing. Doctors pursued financing through Barclay's Bank PLC ("Barclay's"), and learned in June 1987 that Barclay's would provide $14 million in financing for both the nursing home and the retirement center project, but would do so only if Doctors provided guarantees equal to one hundred percent of the $14 million loan. Alternatively, Barclay's would provide financing for the nursing home project alone, but would still require a one-hundred-percent guarantee from Doctors totalling over $5.5 million. Doctors failed to inform Hazelbaker until late August 1987 that its chosen source of financing would require this particular allocation of credit enhancements, which substantially disrupted Hazelbaker's financing plans. If Barclay's were to require full guarantee by Doctors of the nursing home financing, this would consume over three-fourths of the $7 million in credit enhancements which Doctors had agreed to provide for the entire project. Nonetheless, Hazelbaker felt that by late August 1987 he was no longer in a position to secure alternate financing and undertake construction before December 23, 1987. Hazelbaker, through Paradigm, and Doctors, through Dennison, entered into a written joint venture agreement on August 28, 1987, and construc-

tion of the nursing home project began in late 1987. Hazelbaker, however, was not able to obtain a financing commitment for the retirement center project until June 1989, when he secured financing from Mid–America Savings & Loan ("Mid–America"). Doctors eventually agreed to guarantee $2.5 million of the Mid–America loan.

It is not in dispute that ultimately Mid–America became insolvent and its receiver, the Resolution Trust Corporation ("RTC"), refused to disburse the final $1.1 million of the retirement center loan. The joint venture eventually defaulted on the Mid–America loan. Pursuant to a settlement agreement, Doctors agreed to pay RTC the sum of $1.7 million in full settlement of the $2.5 million guarantee that Doctors had given to secure the Mid–America loan.

As part of the retirement project, Paradigm and Hazelbaker had executed a mutual guaranty agreement ("the Mutual Guaranty") under which Paradigm and Hazelbaker jointly and severely guaranteed to Doctors reimbursement for fifty percent of all amounts paid by Doctors under the guarantee which Doctors had given to secure the Mid–America loan.

Pursuant to the provisions of this mutual guaranty, Doctors demanded payment from Hazelbaker and Paradigm of $850,000 representing one-half of the settlement amount paid to RTC in satisfaction of Doctors' obligations under the Mid–America loan guarantee. When Hazelbaker and Paradigm refused to reimburse Doctors under the mutual guaranty, Doctors and Dennison filed this action seeking to enforce the mutual guaranty. Hazelbaker and Paradigm counterclaimed, alleging that Doctors and Dennison had breached their fiduciary duty and implied duty of good faith and fair dealing in pursuit of the joint venture.

Appellees moved for summary judgment on their claim and on appellant's counterclaim. The trial court granted summary judgment for appellees, finding that appellant was bound to pay Doctors $850,000 under the clear and unambiguous language of the mutual guaranty. The court further examined the specific written provisions of the joint venture agreement executed by the parties, and concluded that Doctors had provided credit enhancements in full compliance with the joint venture agreement, and had thus not breached its obligations under the contract. With respect to the breach of implied duty of good faith and fair dealing, the trial court concluded that appellant had failed to inquire, participate, or disapprove with respect to the financial arrangements between Barclay's and Doctors. The court found that the terms of the written joint venture agreement required both parties to approve and accept any financial arrangement, and that nothing in the record indicated that Doctors had breached the written agreement with respect to financing arrangements. Finally, the trial court concluded that no fiduciary relationship arose between the parties until the written joint venture agreement was executed, that no such claim could be raised prior to the execution

of the written agreement, and that appellees' conduct after the execution of the written agreement did not constitute a breach of fiduciary duty. The trial court accordingly granted summary judgment for appellees on their claim to enforce the mutual guaranty in the amount of $850,000, plus interest, and for appellees on appellant's counterclaim.

Appellant has timely appealed and brings the following assignment of error:

"The trial court erred in granting appellees' motion for summary judgment in the face of genuine issues of material fact that must be resolved at trial."

Initially we note that, in accordance with Civ.R. 56, summary judgment should be granted only if, when the evidence is construed most strongly in favor of the nonmoving party, there remains no genuine issue of fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. A motion for summary judgment forces the nonmoving party to produce evidence for any issue for which the party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus.

Although the facts of this case, even as set forth above in considerably abbreviated form, present a fair degree of complexity, the issues upon appeal are closely circumscribed. While much of the trial court's decision, and consequently much of appellees' brief upon appeal, are devoted to an analysis of the terms of the written joint venture agreement executed between the parties, those terms are not determinative of the issues raised in this appeal. Appellant's position is that the breach of fiduciary relationship occurred prior to the signing of the joint venture agreement, and as such was not a breach of the explicit terms of the written agreement but rather a breach of the implicit fiduciary relationship created by the parties' prior decision to go forward with the joint venture at issue in this case. The terms of the written joint venture agreement, under the view presented by appellant, are a result of the alleged breach of fiduciary duty which led to appellant's executing the written agreement under economic duress. As such, the terms of the written agreement are largely immaterial to a determination of whether a breach occurred, since such a breach must of necessity have preceded the execution of the written agreement.

The first logical step in appellant's argument is that the trial court erred in specifically concluding that as a matter of law "the fiduciary relationship between the parties commenced when the parties signed the joint venture agreement on August 28. Prior to that date, plaintiffs had no fiduciary relationship and no duty to defendants." Appellant is correct that joint venturers may

incur fiduciary obligations to each other regardless of whether any written agreement is then in force, since such a writing is not necessary for the creation of such a venture.

"A joint venture is ' * * * an association of persons with intent, by way of contract, *express or implied,* to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, to each of the other coadventurers * * *.' " (Emphasis added.) *Al Johnson Constr. Co. v. Kosydar* (1975), 42 Ohio St.2d 29, 71 O.O.2d 16, 325 N.E.2d 549, paragraph one of the syllabus.

Although fiduciary obligations may be created from an informal relationship, this can only be the case where both parties understand that a special trust or confidence has been reposed. *Umbaugh Pole Bldg. Co. v. Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320; *Stone v. Davis* (1981), 66 Ohio St.2d 74, 20 O.O.3d 64, 419 N.E.2d 1094.

An examination of the affidavit of Hazelbaker reveals the following pertinent factual assertions, which must be taken as true for purposes of summary judgment: After discussions, but prior to execution of a written agreement, the parties proceeded with the intent to form a joint venture to develop the nursing home and retirement center projects. Doctors would provide up to $2.5 million in credit enhancements on the nursing home project, and, *if it chose to participate in the retirement center project,* an additional $4.5 million for a total of $7 million in credit enhancements. Approximately one-third of the credit enhancements were to be applied to the nursing home project, with the remaining two-thirds to be applied to the retirement center project; this credit enhancement ratio was reflected in the fees to be paid to Doctors for providing the credit enhancements.[1] Doctors took the lead in arranging financing for the nursing home project, and Hazelbaker informed Doctors that he trusted and relied upon Doctors to arrange such financing. In June 1987, Doctors was informed by Barclay's Bank that $14 million in financing would be provided for both projects, but subject to full guarantee by Doctors. Alternatively, Barclay's informed Doctors that a one-hundred-percent guarantee would also be required even if only the nursing home

---

1. The affidavit of Ralph Hazelbaker is not entirely clear on whether this description of the credit enhancement allocation is derived from the written agreement eventually executed by the parties, or is the outcome of pre-agreement discussion between the parties. For purposes of assessing the evidence in review of summary judgment, we shall examine the evidence in a light most favorable to appellant, that is, by interpreting this as an allocation of credit enhancements which was agreed upon between the parties prior to execution of a written agreement.

project was financed. These facts were not reported to Hazelbaker until late August 1987, at which time he was under such acute time pressure to begin construction that he could no longer arrange alternate financing for the nursing home project, and the entire business enterprise proceeded along its course to ultimate disaster.

It is apparent that there is at the very least a material issue of fact, and one might conclude a high probability, that the parties were joint venturers with respect to the nursing home project prior to the execution of any written agreement. A fact which clearly springs forth from Hazelbaker's affidavit, however, is that even as the parties explored financing with the assumption that Doctors would participate in the nursing home project, Doctors remained uncommitted to the retirement center project. Nor is any deadline asserted for Doctors to either commit to, or withdraw from, the retirement center. This is in direct contradiction with the subsequent assertion, in Hazelbaker's affidavit, that it was his "understanding and intention that the financing that was to be secured by Doctors and Dennison would be sufficient to pay for the construction, marketing and start-up of the nursing home and retirement center projects without the need for additional capital contributions by or loans from the joint venture. This understanding is reflected in section 2.05 of the joint venture agreement."

Since Hazelbaker asserts elsewhere that Doctors' participation in the retirement center project remained optional, it is difficult to discern, on these facts, that Doctors eventual overallocation of credit enhancements to the nursing home project, in the amount of $5.5 million instead of $2.5 million, and resulting underallocation of credit enhancements to the retirement center project, in the amount of $1.5 (ultimately increased to $2.5 million) rather than $4.5 million, as Hazelbaker believed to be the contemplation of the parties, could constitute a breach of fiduciary duty where, as Hazelbaker asserts, it was the contemplation of both Doctors and Hazelbaker that Doctors might not participate in the retirement center at all. Because Doctors' participation in the retirement center project remained optional in the contemplation of the parties, the facts as alleged do not constitute a breach of fiduciary duty where Doctors, in exploring its financing options through Barclay's, was apprised of a fact that might preclude it from participating in the retirement center under the terms discussed by the parties; Doctors was, at that time, free to forgo participation in the retirement center project at all, so that Hazelbaker could not assert a firm expectation to the $4.5 million in credit enhancements which Doctors was to provide, *if* it was to participate in the retirement center project.

The facts as we find them in this case, therefore, may establish the existence of a fiduciary duty on the part of Doctors arising out of the joint venture prior to

execution of the written agreement, and we agree with appellant that the trial court erred in determining that no fiduciary relationship existed between the parties prior to August 28, 1987, when the written agreement was executed. The facts do not, however, establish a breach on the part of Doctors of that fiduciary duty. The alleged misallocation of credit enhancements, and alleged two-month delay in reporting the terms of Barclay's to Hazelbaker, do not constitute a breach of fiduciary duty, good faith, or fair dealing, where Doctors was as yet uncommitted to proceed with the retirement center project at all. As the trial court noted, it appears that the appellant in this case failed to inquire or participate in the negotiation of financial arrangements with Barclay's. The general lines of the progress of negotiations between Doctors and Barclay's, which ultimately concluded in Doctors' fully guaranteeing the nursing home loan and thus depleting its ability to guarantee the retirement center loan, do not constitute bad faith or unfair dealing on the part of Doctors, where Doctors was not obligated to continue with the retirement center project at all, and was in good faith progressing towards the parties' mutual objective of obtaining financing for the nursing home project. Hazelbaker's expectation was that Doctors would provide $2.5 million of credit enhancements for the nursing home; this was done. We therefore conclude that there was no breach of fiduciary duty on the part of Doctors or Dennison in this case.

█ The defense of economic duress in Ohio requires that "the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion." *Blodgett v. Blodgett* (1990), 49 Ohio St.3d 243, 246, 551 N.E.2d 1249, 1251. Because we have concluded that there was no breach of fiduciary duty, bad faith, or unfair dealing on the part of Doctors or Dennison in this case, appellees cannot be said to have contributed through a wrongful act to the alleged financial straights which compelled Hazelbaker to enter into the subsequent joint venture agreement with Doctors and Dennison. The defense of economic duress is therefore inapplicable in this case.

Based upon the foregoing, the trial court did not err in granting summary judgment for appellees. Appellant's assignment of error is without merit. Therefore, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

CLOSE and HOLMES, JJ., concur.

ROBERT E. HOLMES, J., retired, of the Supreme Court of Ohio, sitting by assignment.