FIRST CAPITAL CORPORATION, Appellee,

v.

G & J INDUSTRIES, INC. et al., Appellants.

[Cite as *First Capital Corp. v. G & J Industries, Inc.* (1999), 131 Ohio App.3d 106.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 73337.

Decided Feb. 8, 1999.

*Buckley, King & Bluso, Rosemary G. Gold, John A. Hallbauer* and *Nancy Heller,* for appellee.

*Ronald N. Towne, Rachel E. Nager* and *Ann L. Wehener,* for appellants.

PATTON, Judge.

Defendant-appellants, G & J Industries, Mary Frechette, and John Frechette ("defendants") appeal (1) the trial court's order denying their motion for summary judgment and (2) the trial court's jury instructions. The transaction at issue is a loan given by plaintiff-appellee First Capital Corporation ("FCC") to defendants.

Mary Frechette is the sole shareholder of G & J and her husband John Frechette is the acting president and general manager of the company. In 1995, John Frechette was approached by an investment group about purchasing G & J. The leading member of this investment group was Louis Kovanda. FCC was contacted to finance the purchase. A meeting was held among the interested parties and terms of the purchase agreement were discussed. It was determined that Kovanda would purchase G & J from Mary Frechette through his holding company, FETLA. Thereafter, Kovanda would become president, John Frechette would become vice-president, and Mary Frechette would become the secretary. FCC would act as the financier.

FCC wrote a proposal letter to Kovanda that spelled out the parameters of the loan. Subsequently, FCC examined the books and records of G & J to verify there was enough collateral to secure the loan. FCC was satisfied with its examination and a meeting was held on February 13, 1996 to sign the loan documents.

Present at this meeting were a representative of FCC, Kovanda, and the Frechettes. All the loan documents were signed in addition to a corporate resolution that named Kovanda president, John Frechette vice-president, and

Mary Frechette secretary of G & J. The resolution also authorized G & J to borrow money from FCC. In addition, Kovanda and the Frechettes each signed a "Trustee and Custodian Agreement" that appointed them to act as a fiduciary on behalf of FCC.

The loan documents contained a payback method that obligated the Frechettes and Kovanda to deposit G & J's accounts receivable income in a FCC bank account when the checks were received. Although this is not the traditional method of repaying a loan, it is often appropriate when the loan is being used to fund a risky project such as the stock purchase in the present case. In anticipation of commencing this payback method Mary Frechette, on February 15 and 22, 1996, executed collateral report forms that contained assignment and security agreements whereby all present and future G & J accounts receivable were assigned to FCC as security for the loan between FCC and G & J. On February 23, 1997, Kovanda delivered to Mary Frechette a check for $50,000. On this same day, FCC disbursed $100,000 on behalf of G & J to pay off a loan and also disbursed $85,000 to Mary Frechette's personal account.

A few days later, Kovanda sent correspondence to the Frechettes and FCC informing both parties that he was not going to purchase the stock of G & J from Mary Frechette and that he was terminating the purchase agreement. On March 4, 1996, FCC sent a letter to Kovanda and the Frechettes indicating that they were defaulting on the loan by not making the necessary deposits from accounts receivable into FCC's bank account. FCC also indicated that it would continue to finance G & J as long as G & J performed all of the obligations outlined in the loan documents. A month later the Frechettes repaid $100,000 of the loaned money.

However, FCC continued to send G & J letters indicating that it was still in default of the loan. On May 6, 1996, FCC sent G & J a letter which stated the amount outstanding on the loan was $100,893.64. This letter also indicated that John Frechette had informed FCC that he was going to approach several banks in an effort to repay the balance of the loan. When FCC did not hear from the Frechettes, they sent out "pay direct" letters to G & J customers stating G & J's accounts receivables were now assigned to FCC and the customers were obligated to make all payments directly to FCC. FCC ultimately received $47,634.27 from the "pay direct" letters.

On June 20, 1996, FCC filed a complaint naming G & J, the Frechettes, Kovanda, FETLA, and G & J's attorneys as parties. The complaint asked for judgment on the loan and security agreements executed by G & J on February 13, 1996. Upon receiving the complaint, defendants requested that FCC provide them with a statement of all the sums FCC claimed it was owed. Four days later FCC sent defendants a letter stating that the current balance was $113,576.

FCC sent an additional letter informing defendants that if they wired the balance, FCC would tender the funds to the "Clerk of Courts, Cuyahoga County" to be held pending the resolution of the action. On June 26, 1996, defendants wired the balance ($113,576) to FCC. The next day FCC sent letters to all of G & J's customers instructing them to resume payments to G & J. FCC then indicated that it wanted defendants to release all claims and demands made against FCC in relation to the instant litigation. Defendants sent FCC a letter saying that it did not believe it had to issue a release since it had paid the amount FCC requested. A month later FCC refunded G & J the sum of $6,244.85 as overpayment of funds it received.

The litigation continued and FCC filed three amended complaints essentially alleging that defendants were liable for certain fees and expenses including attorney fees and were required to provide FCC with a full release, and that Mary Frechette, who personally guaranteed performance under the agreements, owed FCC amounts incurred for fees and expenses as a result of her breaching her contractual duties. FCC requested a declaratory judgment stating that it was legally entitled to retain such amounts already collected from defendants. Defendants answered by denying all allegations and stating that the attorney fees provision and provision relating to releases were unenforceable as against public policy. Defendants asserted twenty-eight affirmative defenses, including that FCC's own negligent conduct barred its recovery, FCC failed to act in good faith, FCC's actions constituted economic duress and extortion, and FCC's recovery was barred by the Uniform Commercial Code. In addition, defendants counter-claimed against FCC, arguing that their business had been damaged by FCC's actions, that FCC acted fraudulently and maliciously, and that they were entitled to punitive damages as a result of FCC's conduct. Subsequently, on April 21, 1997 defendants filed a motion for summary judgment, which was overruled by the trial court. Then during the course of pretrial preparations, Kovanda and FETLA corporation were dismissed as defendants as well as G & J's attorneys. Thus, the only remaining parties left for litigation were G & J, the Frechettes, and FCC. The case proceeded to trial and after a five-day jury trial the jury found in favor of FCC regarding all claims, counterclaims, and cross-claims. The jury awarded FCC $1 on each of the three verdicts. Defendants timely filed their notice of appeal and now present two assignments of error.

In their first assignment of error defendants state as follows:

"The trial court erred in denying defendant–appellant's motion for summary judgment."

First, defendants argue that the provision in FCC's accounts receivable finance agreement that gave them the right to recover attorney fees is unenforceable. In support, defendants claim that Ohio law forbids the award of attorney fees

relating to debt obligations because it is against public policy. Moreover, defendants maintain that they did not have equal bargaining strength and the attorney fee provision was in the sole interest of FCC as evidenced by the language of the provision itself, which states that "attorney's fees * * * shall be payable (whether the above are reasonable or not), on demand, by Borrower to Lender."

FCC cites *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 156, 642 N.E.2d 615, 619, and counterargues that the trial court's denial of summary judgment moots any subsequent arguments that raise the same issues. It also claims that agreement between contracting parties to pay the other's attorney fees is enforceable and not void as against public policy. In addition, FCC argues that even if the words "reasonable attorney fees" were required this was satisfied by the wording in the guaranty of validity of collateral signed by Mrs. Frechette individually.

In *Continental, supra*, the Ohio Supreme Court held:

"Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Id.* at syllabus.

The court's holding pertained to questions of fact that were raised both in Continental's motion for summary judgment and at trial. The court found that a jury is the ultimate trier of fact and substantial justice is done by a jury determining factual issues. Thus, raising the same factual issues on appeal is made moot by a jury's determination. However, a jury does not decide questions of law, and the court made this distinction when it cited *Balson v. Dodds* (1980), 62 Ohio St.2d 287, 16 O.O.3d 329, 405 N.E.2d 293, for the proposition that a denial of summary judgment is not rendered harmless when predicated upon "pure questions of law." Applying this reasoning to the present case distinguishes the holding in *Continental* because defendants' appeal from the denial of their motion for summary judgment is based on a contract, which raises pure questions of law, and therefore it is not rendered moot by the trial's disposition.

The next issue is whether the attorney fee provision in the loan documents is enforceable. The provision at issue is in paragraph 10.2 in the accounts receivable finance agreement and states as follows:

"*Expenses and Attorney's Fees* (A) If, at any time or times, whether prior or subsequent to the date hereof and regardless of the existence of an Event of Default, Lender employs counsel for advice or other representation ·or incurs legal and/or other costs and expenses * * * the attorney's fees arising from such

services and all expenses, costs, charges, paralegal fees, and other fees of counsel or of Lender * * * shall be payable (whether the above are reasonable or not), on demand, by Borrower to Lender * * *."

This court has upheld attorney fee provisions in contractual matters in the following recent cases: *Gaul v. Olympia Fitness Ctr., Inc.* (1993), 88 Ohio App.3d 310, 623 N.E.2d 1281; *First Fed. Sav. Bank v. WSB Invest., Inc.* (1990), 67 Ohio App.3d 277, 586 N.E.2d 1159; and *Georgetown of the Highlands Condominium Owners Assn. v. Yelsky* (Nov. 21, 1991), Cuyahoga App. No. 59410, unreported, 1991 WL 244471. All three of these cases involved real property disputes where the attorney fee provisions were in condominium declarations. We relied on the Ohio Supreme Court's reasoning in *Nottingdale Homeowners' Assn., Inc. v. Darby* (1987), 33 Ohio St.3d 32, 514 N.E.2d 702 in all three cases. In *Nottingdale,* the court held at 37, 514 N.E.2d at 702–703:

"[P]rovisions contained within a declaration of condominium ownership and/or condominium bylaws * * * that a defaulting unit owner be responsible for the payment of attorney fees incurred by the unit owners' association * * * are enforceable and not void as against public policy so long as the fees awarded are fair, just and reasonable * * *."

Defendants argue that *Nottingdale* is not applicable to the present case because the facts are dissimilar and there is no broad language extending its holding. Defendants are correct. In *Nottingdale* the court considered a non-commercial real property transaction, which is dissimilar to the instant case's commercial loan transaction. However, defendants' argument that there is no broad language in *Nottingdale* is misplaced. The court specifically stated:

"It has long been recognized that persons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced. This freedom 'is as fundamental to our society as the right to write and to speak without restraint.' Government interference with this right must therefore be restricted to those exceptional cases where intrusion is absolutely necessary such as contracts promoting illegal acts." *Id.* at 36, 514 N.E.2d at 705–706.

The court concluded by stating:

"In sum, this court will not interfere with the right of the people of this state to contract freely and without needless limitation. A rule of law which prevents parties from agreeing to pay the other's attorney fees, absent a statute or prior declaration of this court to the contrary, is outmoded, unjustified and paternalistic." *Id.* at 37, 514 N.E.2d at 706–707.

Moreover, *Nottingdale* was expanded and followed in two other commercial situations. *Hilb, Rogal & Hamilton Agency of Dayton, Inc. v. Reynolds* (1992), 81 Ohio App.3d 330, 335–336, 610 N.E.2d 1102, 1105–1107 (trial court reversed

where it refused to enforce payment of attorney fees for breach of an employee covenant not to compete) and *GMS Mgt. Co., Inc. v. K & K Indus. Inc.* (Apr. 29, 1991), Stark App. No. CA–8279, unreported, 1991 WL 70154 (court held "it would be illogical to hold unenforceable a contractual provision for the payment of attorney fees in a commercial transaction where there is no evidence of unequal bargaining positions and no evidence of compulsion or duress").

Defendants argue that the reasoning in *Worth v. Aetna Cas. & Sur. Co.* (1987), 32 Ohio St.3d 238, 513 N.E.2d 253 and *Miller v. Kyle* (1911), 85 Ohio St. 186, 97 N.E. 372, is applicable to the present case and a contract provision in a commercial situation is unenforceable as against public policy because the provision acts as a penalty against the defaulting party, evades usury laws, and promotes litigation. We find this reasoning unpersuasive in light of the facts of the present case. In *Worth*, two sophisticated parties freely negotiated the terms of an indemnity agreement that contained an attorney fee provision. The court upheld the indemnity agreement and underlying attorney fee provision but stated that payment of attorney fees where one party defaults on debt obligations is against public policy because ordinarily "the promise to pay counsel fees is not arrived at through free and understanding negotiation." In *Miller, supra,* an attorney fee provision was found to be contrary to public policy and void when contained in a promissory note because it promoted litigation and evaded the usury laws. The court based this holding on the fact that the provision was contained in a negotiable instrument where in general the terms of the instrument are not freely negotiable.

We read *Nottingdale* and the cases cited above as holding that attorney fee provisions are unenforceable in those commercial situations where there is uneven bargaining position, where the provision promotes litigation and illegal acts such as evading the usury laws, where the provision acts as a penalty, and where the terms of the provision are not freely negotiable. However, we find that attorney fee provisions are enforceable in situations where there are equal bargaining positions, the parties are of similar sophistication, and both parties had the opportunity to obtain counsel to review the provision and negotiate its terms.

In the present case, the attorney fee provision was not contained in a negotiable instrument such as a promissory note but was in a loan agreement whose terms were freely determined by both parties. Moreover, both parties were sophisticated in business. Defendants were running their own company, G & J, and were involved with various other businesses. In fact, John Frechette stated that one reason why he wanted to sell G & J was to pursue other business interests. Similarly, FCC specialized in financing various projects and ventures. Also, a representative of FCC gave uncontested testimony at trial that it is a

policy of FCC to inform and encourage prospective customers to have counsel available and defendants were given this opportunity but chose not to be represented. Additionally, this same representative testified that the Frechettes reviewed the documents before they signed them.

This is not a case of an adhesion contract where, because of one party's strong bargaining position, the terms of a contract are negotiated favorably towards that party. Both parties were sophisticated, both parties had the opportunity to review the contracts and be represented by counsel, and there is no evidence of compulsion or duress. Therefore, we follow the Ohio Supreme Court's holding in *Nottingdale* and our own holding in *Gaul* and find that the awarding of attorney fees is allowed by contractual provisions.

■ Second, defendants argue that the provisions in the loan documents that gave FCC the right to obtain a release is unenforceable as a matter of law. Defendants claim that these provisions are a demand by FCC that defendants release their right to sue and that such provisions are unenforceable as a matter of law. They base this argument on the fact that if they can no longer sue FCC, then there is nothing stopping FCC from breaching its contractual and legal obligations to defendants. In addition, defendants contend that the release provisions are illusory because by their very nature the releases discharge FCC from any contractual or legal obligations and thus FCC "would no longer be liable for any claims whatsoever."

FCC maintains that it never argued that the release provisions prohibited defendants from suing with regard to any claims that may have arisen after execution of the documents. FCC states further that the loan documents do not purport to deny defendants the right to seek court determination of matters between defendants and FCC. An example of this, FCC submits, is the week-long trial that occurred in the present case. FCC claims that the release language does not act as a bar to litigation but rather establishes a contractual commitment that defendant would give FCC a release upon termination of their relationship.

The release provision at issue is in section 2.3(E) of the account receivable finance agreement, and it states as follows:

"Upon termination, however occurring, Borrower covenants and agrees that Borrower shall deliver to Lender such documents * * * as Lender may require in order to release and indemnify Lender from any and all claims and causes of action arising out of the Revolving Credit Commitment and the loans incident thereto. Borrower covenants and agrees that Lender shall be under no obligation to release its liens and security interest in the Collateral until such time as Lender has received such documentation."

Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411. When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 406, 374 N.E.2d 146, 150.

We do not view the language in the above provision as ambiguous or prospectively barring defendants from seeking redress with the courts. Our interpretation is that upon termination of the contract, defendants were either to provide a release of all claims and causes of action to FCC or to pursue litigation. In the present case, FCC requested repayment of the loan and a release from defendants. When the loan was not paid to its satisfaction and not having received a release, FCC filed a complaint. Upon receipt of the complaint, defendants counterclaimed against FCC. By counterclaiming against FCC, defendants gave themselves the opportunity to present evidence of their claims or causes of action to a jury. This is exactly the situation that they now argue on appeal they were precluded from accomplishing. Based on the foregoing, we find that the above provision is enforceable and did not force defendants to release their right to sue.

Defendants also argue that the provision is illusory because if they have to provide FCC with a release of all claims, then there is nothing stopping FCC from breaching the contract. "[A] contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." *Domestic Linen v. Kenwood Dealer Group* (1996), 109 Ohio App.3d 312, 316, 672 N.E.2d 184, 186.

FCC promised to give defendants a loan and in fact did loan defendants money. Defendants promised to repay the loan by depositing their accounts receivable checks in FCC's bank account, which they did not do. Defendants do not present any evidence that FCC breached the terms of the contract or did not fulfill its obligations under the loan documents. Defendants also do not present any evidence that FCC was given an unlimited right under the loan documents to breach the terms of the document. The release provision did not bar defendants from pursuing litigation and did not provide FCC with an unlimited right to breach the terms of the loan documents. There is simply no language in the loan documents that indicates that defendants do not have the right to pursue litigation or that FCC has an unlimited right to breach the terms of the loan.

In accordance with Civ.R. 56, summary judgment should be granted only if, when the evidence is construed most strongly in favor of the nonmoving party, there remains no genuine issue of material fact, the moving party is entitled to

judgment as a matter of law, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. *Doctors Hosp. v. Hazelbaker* (1995), 106 Ohio App.3d 305, 665 N.E.2d 1175.

After construing the evidence most strongly in favor of FCC, we find that the trial court was correct in denying defendants' motion for summary judgment and finding that there still remained genuine issues of material fact to which reasonable minds could come to more than one conclusion. Accordingly, defendants' first assignment of error is overruled.

Defendants' second assignment of error states as follows:

"The trial court erred by instructing the jury that all of the defendants–appellants had signed the loan documents."

Defendants argue that the trial court erred in instructing the jury that all three defendants, G & J and the Frechettes, had signed the loan documents when in fact neither of the Frechettes signed the promissory note or accounts receivable finance agreement. Thus, they could not be bound by these agreements. Defendants maintain that the determination of whether they signed these documents is a question of fact and this instruction by the trial court usurped the role of the jury as the sole trier of fact. Defendants also complain that the plain error doctrine does not apply to the trial court's erroneous instruction because the instruction was a manifest miscarriage of justice that in effect allowed questions of fact to be decided by the trial court rather than the jury.

Defendants failed to object to the trial court's jury instruction regarding their signing of the loan documents. Civ.R. 51(A) provides that "[o]n appeal, a party may not assign as error the giving or the failure to give an instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Similarly, it is recognized that the failure to timely advise a trial court of possible error, by objection or otherwise, results in waiver of the issue for purposes of appeal. *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 121, 679 N.E.2d 1099, 1103. It is well established that plain error or error affecting a substantial right may be brought to the attention of the reviewing court. However, it is clear that this doctrine "may be applied only in extremely rare cases involving exceptional circumstances where error, to which no objection was made to the trial court, seriously affects the basic fairness, integrity, or public reputation of judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Id.* at 122–123, 679 N.E.2d at 1104.

The instruction defendants complain of states as follows:

"Ohio law presumes that parties to loan documents, which are a contract, intend for them to be an enforceable obligation. It is undisputed that defendants

G & J Industries, Inc., John and Mary Frechette signed the applicable loan documents. Therefore, you must find that the defendants, G & J Industries, Mary and John Frechette, had read the loan documents they signed, and they are bound by the terms of the loan document."

"In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.'" *Kokitka v. Ford Motor Co.* (1995), 73 Ohio St.3d 89, 93, 652 N.E.2d 671, 674, quoting *Becker v. Lake Cty. Mem. Hosp. W.* (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165, 170–171.

■ The record reveals that a stock purchase and sale agreement was entered into where the Frechettes agreed to sell G & J to Louis Kovanda. This agreement was signed by Mary Frechette, as seller, and by Louis Kovanda, as buyer. The agreement also authorized Kovanda to negotiate on behalf of G & J and bind G & J to lending terms. The next material document was a corporate resolution which was signed by Louis Kovanda, John Frechette, and Mary Frechette, in their capacities as corporate officers of G & J. This resolution authorized G & J to borrow money from FCC.

The next set of documents in the record are what bound G & J and the Frechettes to FCC. First is the accounts receivable finance agreement ("ARFA"). The ARFA was signed by Louis Kovanda as president of G & J. It stated that G & J was going to borrow money from FCC and in return G & J would use its accounts receivable as collateral for the loan. The ARFA stated that G & J was to deposit its accounts receivable directly into an FCC bank account and thereafter FCC would loan G & J up to eighty percent of the value of the collateral. A revolving credit note was signed by Louis Kovanda, as president of G & J, and this obligated G & J to repay to FCC the money it was advanced. The final material documents were the two trustee/custodian agreements. John Frechette personally signed one and Mary Frechette personally signed the other. These two agreements bound the Frechettes to act as fiduciaries on behalf of FCC. The agreements stated that the Frechettes' fiduciary duties included making sure that G & J delivered all its accounts receivable to FCC and maintaining records of G & J's accounts receivables on behalf of FCC. The Frechettes fulfilled neither of these duties.

The jury heard evidence that the Frechettes reviewed all of the loan documents and individually or together either signed or attested to signatures on these documents. It is true that Mary Frechette merely attested to other signatures on the promissory note and accounts receivable finance agreement and John Frechette did not sign these documents at all. However, Kovanda, who was president of G & J industries, did sign the documents, thereby obligating G & J

Industries and its sole shareholder, Mary Frechette. Mary Frechette was also obligated by the fact that she personally signed a guarantee of validity of collateral for G & J. Moreover, the Frechettes each signed trustee/custodian agreements that obligated them personally to ensure that G & J deposited its accounts receivable in an FCC bank account. We find that the instructions, while not entirely correct regarding who signed the documents, did not mislead the jury in such a way as to materially affect defendants' substantial rights.

Based on the foregoing analysis, we hold that this is not the rare case where the circumstances require application of the plain error doctrine to prevent a manifest miscarriage of justice. Accordingly, defendants' second assignment of error is overruled.[1]

*Judgment affirmed.*

TIMOTHY E. McMONAGLE, P.J., and SPELLACY, J., concur.

---

1. FCC submitted eight cross-assignments of error to be considered if the judgment of the trial court was reversed or modified. Because the judgment of the trial court was affirmed, we need not address the cross-assignments.