JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff-appellant, Buckeye Check Cashing, Inc., dba Checksmart ("Checksmart"), appeals the trial court's award of damages. Finding merit to the appeal, we reverse.
 {¶ 2} This matter arises from a complaint filed by Checksmart against defendant-appellee, Shannon Madison ("Madison"), for her failure to repay her payday advance loan. In October 2006, Madison obtained a payday advance loan from Checksmart in the amount of $400. As part of the transaction, Madison executed a contract that required her to pay $60 as a check cashing charge, $20 as a potential returned check fee, and interest at the rate of five percent per month or any fraction of a month on the unpaid principal of the loan. The agreement also required Madison to pay any attorney fees Checksmart might incur to collect the loan principal, interest, and other charges in the event she defaulted on the contract.
 {¶ 3} To secure the payday advance, Madison executed a check postdated October 21, 2006 (the due date of the loan) in the amount of $460. When Madison did not pay the $460 on October 21, 2006, Checksmart attempted to deposit her check, but it was returned with "account closed" printed on the check.
 {¶ 4} In June 2007, Checksmart filed suit seeking judgment against Madison for the principal loan amount ($400), interest at the rate of five percent *Page 3 
per month or fraction thereof ($117.04), the check cashing or loan origination fee ($60), the return check fee ($20), and attorney fees ($250), for a total of $847.04, along with its costs and interest on the judgment. The matter was heard before a magistrate in August 2007. Madison never filed an answer and did not appear at the hearing. The magistrate awarded Checksmart $480 plus interest from October 21, 2006, at the statutory rate of eight percent per annum. Checksmart objected to the magistrate's decision. Checksmart's objections were heard by the judge, who overruled the magistrate's decision. The judge reduced Checksmart's judgment to $400 and awarded court costs and interest from October 21, 2006, at the annual rate of eight percent.
 {¶ 5} Checksmart now appeals, raising four assignments of error for our review, which shall be addressed together where appropriate.
 {¶ 6} In the first assignment of error, Checksmart argues that the trial court erred in violation of R.C. 1315.39(B) by failing to award statutory interest on the unpaid principal of the payday loan. In the second assignment of error, Checksmart argues that the trial court erred in violation of R.C. 1315.40(A) by failing to award the loan origination fee (check cashing charge). In the third assignment of error, Checksmart argues that the trial court erred in violation of R.C. 1315.40(B) by failing to award the returned check fee.
 Check-Cashing Legislation *Page 4 {¶ 7} In May 2005, the General Assembly enacted R.C. 1315.35, et seq., to regulate loan transactions by check-cashing businesses.[1] The legislature defined the term "check-cashing business" and set forth the conditions for making loans, how interest is calculated, and the fees and charges a check-cashing business may charge, collect, and receive.
 {¶ 8} R.C. 1315.39(A)(4) provides that a check-cashing business may engage in the business of making loans provided, among other things, that:
 "The loan is made pursuant to a written loan contract that sets forth the terms and conditions of the loan, and discloses in a clear and concise manner all of the following:
 (a) The total amount of fees and charges the borrower will be required to pay in connection with the loan pursuant to the loan contract; *Page 5 
 (b) The rate of interest contracted for under the loan contract, calculated both as an annual percentage rate based solely on the principal of the loan and as an annual percentage rate based on the sum of the principal of the loan and the loan origination fee, check collection charge, and all other fees or charges contracted for under the loan contract;
 (c) The total amount of each payment, when each payment is due, and the total number of payments that the borrower will be required to make under the loan contract * * *."
 {¶ 9} R.C. 1315.39(B) provides that a "check-cashing business may contract for and receive interest at a rate of five per cent per month or fraction of a month on the unpaid principal of a loan made * * *."
 {¶ 10} R.C. 1315.40(A) and (B) provide that a check-cashing business may charge, collect, and receive certain fees and charges, such as: a "[l]oan origination fee not exceeding an amount equal to five dollars per fifty dollars up to five hundred dollars of the amount of the loan" and "[c]heck collection charges not exceeding an amount equal to twenty dollars * * *."
 Loan Origination Fee, Returned Check Fee, and Interest {¶ 11} Checksmart argues that the trial court erred because the contract at issue explicitly sets forth the terms and conditions of the loan as required by R.C. 1315.39 and 1315.40.
 {¶ 12} When the language in a contract is reasonably susceptible to more than one interpretation, the meaning of the ambiguous language is a question of fact. Inland Refuse Transfer Co. v. Browning-FerrisIndustries of Ohio, Inc. (1984), 15 Ohio St.3d 321, 474 N.E.2d 271. However, if no ambiguity exists, the *Page 6 
terms of the contract must simply be applied without resorting to methods of construction and interpretation. The Ohio Supreme Court has held that "if a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." Id.; Alexander v. Buckeye Pipe Line Co. (1978),53 Ohio St.2d 241, 374 N.E.2d 146.
 {¶ 13} In the instant case, Madison signed a contract agreeing to pay Checksmart $60 as a loan origination fee, $20 as a returned check fee, and interest on the unpaid principal of the loan ($117.04) when she obtained a $400 loan from Checksmart. The relevant portions of the contract are as follows:
 "Prepayment: * * * You [Madison] agree to pay a minimum finance charge of $60.00 as allowed by Ohio law. * * *
 Collection Dishonor and Other Charges: You agree to pay a fee of Twenty Dollars ($20.00) * * * for each check * * * you issue in connection with this contract that is returned or dishonored for any reason. * * *
 Interest on Outstanding Loans: If we [Checksmart] * * * deposit your check for payment to your bank because your loan was not paid on, or before, the due date and your bank dishonors * * * the check, we may charge interest at a rate of 5% per month or any fraction of a month on the unpaid principal of the loan for each month or partial month that the loan remains outstanding * * *."
 {¶ 14} We find that these loan agreement terms are clear and unambiguous. The above provisions clearly set forth the fees and charges Madison agrees to pay in the event she defaults on her loan. Furthermore, when R.C. 1315.39 and 1315.40 are read in conjunction, they provide that a check-cashing business may contract for and receive: interest on the unpaid portion of the loan principal, a loan origination fee, and a returned check fee, provided that *Page 7 
these terms are included in the written loan agreement. Therefore, Checksmart is entitled to receive $60 as a loan origination fee, $20 as a returned check fee, and $117.04 in interest on the unpaid principal of the loan. Accordingly, we find that the trial court erred as a matter of law by only awarding Checksmart the original loan amount of $400 and interest at eight percent per annum.
 {¶ 15} Thus, the first, second, and third assignments of error are sustained.
 Attorney Fees {¶ 16} In the fourth assignment of error, Checksmart argues that the trial court erred in failing to award $250 in attorney fees as provided for in the loan agreement.
 {¶ 17} Checksmart relies on Nottingdale Homeowners Assn., Inc. v.Darby (1987), 33 Ohio St.3d 32, 514 N.E.2d 702, and contends that it is entitled to attorney fees because parties may contract to require the unsuccessful party pay the prevailing party's attorney fees.[2]
 {¶ 18} In Nottingdale, the Ohio Supreme Court held that an attorney fees provision in a non-commercial agreement (condominium association declaration) was "enforceable and not void as against public policy so long as the fees *Page 8 
awarded are fair, just and reasonable as determined by the trial court upon full consideration of all of the circumstances of the case." Id.
 {¶ 19} The Nottingdale court noted that: "[i]t has long been recognized that persons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced. This freedom `is as fundamental to our society as the right to write and to speak without restraint.' Government interference with this right must therefore be restricted to those exceptional cases where intrusion is absolutely necessary, such as contracts promoting illegal acts." Id. (Internal citation omitted.)
 {¶ 20} Furthermore, the court stated that it "will not interfere with the right of the people of this state to contract freely and without needless limitation. A rule of law which prevents parties from agreeing to pay the other's attorney fees, absent a statute or prior declaration of this court to the contrary, is outmoded, unjustified and paternalistic." Id. *Page 9 
 {¶ 21} The holding in Nottingdale has been expanded by this court to apply in commercial situations as well. In First Capital Corp. v. G J Industries, Inc. (1999), 131 Ohio App.3d 106, 721 N.E.2d 1084, we upheld an attorney fees provision contained in a loan agreement where both parties had equal bargaining power.[3] However, in the instant case, Madison presented no evidence in the trial court nor any argument before this court regarding this issue.
 {¶ 22} The contract in the instant case provides that "except as expressly prohibited by law, you [Madison] agree to pay the reasonable attorney's fees, damages, other costs and disbursements [Checksmart] has incurred to collect this contract in the event of your default."
 {¶ 23} We find that this provision is also unambiguous. It clearly sets forth the charges Madison agrees to pay in the event she defaults on her loan.[4] Madison demonstrated her agreement to these terms by signing the contract and issuing Checksmart a check for $460. In its complaint, Checksmart asked for *Page 10 
$250 in attorney fees, which represents one hour of counsel's time. However, the court only awarded Checksmart the original loan amount of $400. *Page 11 
 {¶ 24} Since parties have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced and the fees requested by Checksmart appear just and reasonable, we find that the attorney fee provision in the instant case is enforceable.[5]
Thus, we find that the trial court erred as a matter of law in failing to award Checksmart attorney fees in the amount of $250.
 {¶ 25} Accordingly, the fourth assignment of error is sustained.
 {¶ 26} Judgment is reversed and the case is remanded for entry of judgment in the amount of $847.04.
It is ordered that appellant recover of said appellee costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the municipal court to carry this judgment into execution. *Page 12 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., J., and MARY J. BOYLE, J., CONCUR
[1] Effective September 1, 2008, the Ohio Assembly repealed R.C. 1315.35 through R.C. 1315.50 and established R.C. 1321.35 through R.C. 1321.48 as the regulatory scheme for businesses engaged in the practice of cashing checks. Because the contract in the instant case occurred prior to the enactment of these statutes, this case is governed by the provisions set forth in R.C. 1315.35, et seq.
[2] Nottingdale was superseded by R.C. 1301.21, as stated in New Mkt.Acquisitions, Ltd. v. Powerhouse Gym (S.D. Ohio, 2001),154 F.Supp. 1213. In May 2000, the Ohio General Assembly passed R.C. 1301.21 to enforce commitments to pay attorney fees if the total amount owed on the contract at the time it was entered into was over $100,000. In the instant case, the amount of the contract is well below the $100,000 threshold; thus, R.C. 1301.21 is not applicable.
[3] First Capital was also superseded by R.C. 1301.21, as stated inNew Mkt. Acquisitions.
[4] Notably, R.C. 1315.40(C) and 1315.41(C), the relevant portions of the statute do not expressly exclude the right of the check-cashing business to contract for the payment of attorney fees.
[5] We note that Madison did not appear at the trial court, has not filed an appeal nor an appearance with this court, nor has she filed a brief in this court. Therefore, we do not reach the issue whether the attorney fees provision is unenforceable as against public policy because Madison has failed to raise this argument or set forth any evidence of duress or unequal bargaining power. *Page 1