**NEW MARKET ACQUISITIONS, LTD., Plaintiff,**

v.

**POWERHOUSE GYM, et al., Defendants.**

**No. C2–99–185.**

United States District Court, S.D. Ohio, Eastern Division.

March 29, 2001.

Dan Jay Binau, Harris, McClellan, Binau & Cox, Columbus, OH, for Plaintiff.

Zora E. Johnson, Dykema & Gossett, Bloomfield Hills, MI, Gregory E. Sutton, Vorys Sater Seymour & Pease, Columbus, OH, Bruce Leroy Ingram, Vorys Sater Seymour & Pease, Columbus, OH, Joseph H. Hickey, Dykeman & Gossett, Andrew Lusk, Bloomfield Hills, MI, Jackie Lee Stewart, David M. Scott, David Michael Whittaker, Luper Sheriff & Neidenthal, Columbus, OH, for Defendants.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

Plaintiff New Market Acquisitions, Limited, filed suit against its tenant, ESB One Berger Enterprises, Inc., for breach of a commercial lease agreement, and against William, Ibitsam, Norman, and Nouha Dabish, the personal guarantors on that lease. Jurisdiction is based on diversity of citizenship. This matter is currently before the Court on several motions: (1) Motion of Third Party Defendant ESB One Berger Enterprises, Inc. for Summary Judgment (Record at 47); (2) Defendants' Motion for Partial Summary Judgment (Record at 48); and (3) Plaintiff's Motion for Partial Summary Judgment (Record at 54).

## I. Background

Eric Berger is the President of ESB One Berger Enterprises, Inc., ("ESB") an Ohio corporation. In the Summer of 1996, Mr. Berger sought to open a health club in Columbus, Ohio. Mr. Berger met with Wil-

liam Dabish of Powerhouse Gym International, Inc., a health club franchise. Dabish agreed to grant ESB a license to operate a Powerhouse Gym. On September 27, 1996, ESB entered into a commercial lease (the "lease") with NYLIFE Realty Partner I ("NYLIFE") for space in the New Market Shopping Center to house the gym. The lease was for a term of ten years. Rent was to be $9,514.64 per month for the first six months; $16,957.64 per month for months 7–18; $14,476.64 per month for months 19–30; $15,407.01 per month for months 31–60; $16,337.39 per month for months 61–90; and $17,267.76 per month for the remaining 29 months. (Ex. A to Dabishes' Mot. Partial Summ. J. ¶ 5.1).

Article 17 of the lease identifies what shall constitute a default on the lease, and what remedies are available in the event of a default. (*Id.* at ¶ 17). The default provisions of the lease, contained in section 17.1, list ten events that could constitute a default including "the failure of Tenant to pay any Rent or other sum of money within seven days after the same is due hereunder." Section 17.2 of the lease then provides for the remedies available in the event of a default. Those remedies include the ability to "elect to terminate this Lease." Article 17 of the lease also provides for the damages that are available in the event of a default on the lease:

> Whether or not this Lease is terminated by Landlord pursuant to Section 17.2, Tenant nevertheless shall remain liable for any Rent and damages which may be due or sustained by Landlord and all reasonable costs, fees and expenses including, but not limited to, leasing fees, attorneys' fees, renovation costs and any other expenses incurred by Landlord in pursuit of its remedies hereunder … If

this Lease is terminated pursuant to Section 17.2, and this termination may occur after the Landlord has pursued other remedies, the Landlord shall upon such termination be entitled to recover an amount equal to the damages, consequential as well as direct, sustained by the Landlord as a result of the Tenant's default, and in addition thereto, an amount equal to the Rent and Additional Rent provided in this Lease for the residue of the Term hereof, less any offset arising from the Landlord's ability to relet the Premises.

(*Id.* at ¶ 17.4).

As a prerequisite for the execution of the lease, NYLIFE asked Mr. Berger for a guaranty on the lease. Mr. Berger again contacted William Dabish, who agreed to sign a personal guaranty (the "guaranty") on the lease, and did so on October 1, 1996.[1] The guaranty reads in pertinent part:

> [Guarantor] hereby guarantees to Landlord the full and prompt payment of rent, including, but not limited to, the annual minimum rent, operating costs and tax reimbursements, additional rent, and any and all other sums and charges payable by Tenant under said Lease and any extension or renewal thereof, as well as guarantees the full and timely performance and observance of all the covenants, terms, conditions, provisions, and agreements therein provided to be performed and observed by Tenant; and Guarantor hereby covenants and agrees to and with Landlord that, if Tenant should at any time default in the payment of any such annual minimum rent, operating costs and tax reimbursements, additional rent, or any other such sums and due and payable

---

1. William Dabish admitted at his deposition that he did not read the guaranty before he signed it. (Dabish Dep. at 30–31).

by Tenant under said Lease, or if Tenant should default in the performance and observance of any other terms, covenants, conditions, provisions, and agreements contained in said Lease, then Guarantor shall and will forthwith pay such rent and other such sums and charges to Landlord and shall and will forthwith faithfully perform and fulfill all of such terms, covenants, conditions, provisions and agreements and will forthwith pay to Landlord all damages that may arise in consequence of any such default by Tenant under said Lease, including, without limitation, all reasonable attorneys' fees and disbursements incurred by Landlord or caused by any such default and/or by the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional Guaranty of payment and of performance. It shall be enforceable by Landlord in a joint action against Guarantor, Tenant, and/or any other guarantor of the Lease, or in a separate and independent action against Guarantor without the necessity for any suit or proceedings on Landlord's part of any kind or nature whatsoever against Tenant or Guarantor of Tenant's failure to pay rent or other charges due under the Lease or of Tenant's default or breach under the Lease or of any other notice or demand to which Guarantor might otherwise be entitled, all of which notices Guarantor hereby expressly waives; and Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished, or impaired by reason of the assertion, or the failure to assert, by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or any other remedy or right which Landlord may have at law or in equity. Guarantor hereby expressly consents and agrees that any such actions against Guarantor may be brought and pursued against Guarantor in the county or judicial district or circuit in which are located the premises which are the subject of the Lease.

This Guaranty shall be a continuing guaranty, and the liability of Guarantor hereunder shall in no way be affected, modified, or diminished by reason of any assignment, renewal, modification, or extension of the Lease or by reason of any modification or waiver of or change in any of the terms, covenants, conditions, provisions, or agreements of said Lease, or by reason of any extension of time that may be granted by Landlord to Tenant, or by reason of any unilateral action of either Landlord or Tenant, or by reason of any dealings or transactions or matter or thing occurring between Landlord and Tenant, including, without limitation, any adjustments, compromises, settlements, accord and satisfactions, or releases, or any bankruptcy, insolvency, reorganization, arrangement, assignment for benefit of creditors, receivership, or trusteeship affecting Tenant, whether or not notice thereof is given to Guarantor, all of which notices Guarantor expressly waives.

(Ex. B to Dabishes' Mot. Partial Summ. J. ¶¶ 1–3).

Originally, William Dabish was the only guarantor. However, when NYLIFE asked for more personal guarantors, William Dabish proceeded to sign on behalf of his wife Ibitsam Dabish, his brother Norman Dabish, and sister-in-law Nouha Dabish ("the Dabishes"). Ibitsam, Norman, and Nouha Dabish subsequently ratified the signatures. (William Dabish Dep. at 51–52.) On May 14, 1997, NYLIFE assigned the lease to the Plaintiff in this

case, New Market Acquisitions, Ltd. ("New Market").

In August of 1997, ESB began to fall behind on its rent payments. (Berger Dep. at 15.) For several months, ESB attempted to make back payments in order to draw level on the rent due and, eventually, ESB attempted to tender payment to New Market in an amount that would have paid all rent in arrears. However, New Market had already viewed the missed payments as a default on the lease and, in June of 1998, in an effort to mitigate its damages, New Market began negotiating with California Fitness I, Inc., to re-let the premises.

In response to ESB's default on the lease, New Market filed suit on September 17, 1998, in the Franklin County Court of Common Pleas (Case No. 98CVE–07–7221), naming ESB and the Dabishes as defendants. New Market sought: (1) possession of the premises; (2) $125,684, representing rent in arrears, interest, and penalties; (3) $1,823,411.15, representing future rent and other charges; and (4) any other direct or consequential damages. On December 15, 1998, New Market entered into a new lease with California Fitness I, Inc.

On February 1, 1999, without the Dabishes' consent or approval, ESB and New Market entered into a settlement agreement. (Ex. C to Dabishes' Mot. Partial Summ. J.). ESB agreed to pay New Market $174,061.56 in exchange for the release of ESB's liability under the lease and the dismissal of ESB from the action pending in the Franklin County Court of Common Pleas.[2] The settlement agreement terminated the lease upon the earlier of midnight April 30, 1999, or when ESB delivered the keys to the premises to New Market. ESB returned the keys on April 27, 1999, thereby terminating the lease. The settlement agreement also provided that:

> neither the payments by Lessee under this Agreement, nor anything else contained in this Agreement or the attached Exhibits are intended to release the guarantors of the Lease, William H. Dabish, Ibitsam Dabish, Norman N. Dabish and Nouha Dabish, from any liability whatsoever under the terms of their guarantees and/or the Lease. As against the guarantors, Lessor is entitled to pursue all remedies and damages under the Lease and/or guarantees it claims to have, including, but not limited to, all remedies available under Paragraph 17 of the lease.

(Ex. C to Dabishes' Mot. Partial Summ. J. ¶ 5).

As the only remaining defendants in the case, the Dabishes, who all reside in Farmington Hills, Michigan, removed the case to this Court based on diversity of citizenship. The Dabishes then proceeded to file a third party complaint against ESB seeking indemnification in the event that the Dabishes are found liable.

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) provides:

> [Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute

---

**2.** The Franklin County Court of Common Pleas entered the agreed judgment entry for the settlement agreement on February 9, 1999. By notice of dismissal dated February 10, 1999, Plaintiff New Market voluntarily dismissed all remaining claims in its complaint against Defendant ESB.

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)); *accord County of Oakland v. City of Berkley,* 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for what was formerly referred to as a directed verdict. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted. *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1455–56 (6th Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes,* 398 U.S. at 157–60, 90 S.Ct. 1598.

If the moving party meets its burden and adequate time for discovery has been

provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

### III. Discussion

#### A. Scope of Dabishes' Liability Under the Guaranty

Both New Market and the Dabishes seek partial summary judgment as to the scope of the Dabishes' liability under the terms of the guaranty.[3] New Market argues that the express terms of the guaranty and lease render the Dabishes liable for all damages resulting from ESB's breach of the lease. However, the Dabishes argue that their liability is capped by the amount of the settlement agreement, and that the termination of the underlying

lease extinguished their obligations as guarantors. New Market disagrees. Finally, the Dabishes argue that many damages sought by New Market accrued after the execution of the settlement agreement and the termination of the lease and, since ESB did not "default" on those obligations, the guarantors cannot be liable for those later accrued damages.

As jurisdiction is based on diversity and the parties have contracted for Ohio law to govern, (Ex. B to Dabishes' Mot. Partial Summ. J. ¶ 7), this Court will apply the substantive law of Ohio to this issue. Under Ohio law, it is well settled that the interpretation of a guaranty is identical to the principles of regular contract interpretation. *See Stone v. Nat'l City Bank,* 106 Ohio App.3d 212, 217, 665 N.E.2d 746, 750 (1995); *see also G.F. Bus. Equip., Inc. v. Liston,* 7 Ohio App.3d 223, 224, 454 N.E.2d 1358, 1359 (1982) (stating that Ohio courts should construe guaranty agreements in the same manner as other contracts).

"Under Ohio law, if the language of a contract is clear and unambiguous, a court may not resort to construction of that language." *Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc.,* 212 F.3d 332, 336 (6th Cir.), *reh'g and sugg. for reh'g en banc denied,* (2000)(*citing Hybud Equip. Corp. v. Sphere Drake Ins. Co.,* 64 Ohio St.3d 657, 665, 597 N.E.2d 1096, 1102 (1992), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993)). Ambiguity exists only where a term cannot be ascertained from the four corners of the contract, or where the contract language is susceptible to two or more reasonable interpretations. *See GenCorp, Inc. v. Amer-*

---

**3.** The Dabishes contend that the Court should not consider New Market's motion for partial summary judgment because it was filed after the initial deadline imposed by the Court. However, the Court notes that New Market's motion for leave to file its motion for partial summary judgment *instanter* was unopposed.

The Court also notes that New Market's motion does nothing more than incorporate by reference the exact arguments set forth in its memorandum contra Defendant's motion for partial summary judgment. Finding no prejudice in this instance, the Court will allow it.

*ican Int'l Underwriters,* 178 F.3d 804, 818 (6th Cir.) *reh'g and sugg. for reh'g en banc denied,* (1999)(interpreting Ohio law). A contract does not become ambiguous because the enforcement of its terms will cause hardship to one of the parties. *See Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.,* 78 Ohio St.3d 353, 362, 678 N.E.2d 519, 526 (1997).

The principal purpose for judicial examination of a clear and unambiguous contract is to ascertain and effectuate the intent of the parties. *See Aultman Hosp. Ass'n v. Community Mut. Ins. Co.,* 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 923 (1989). Thus, if the terms of the contract are clear and unambiguous, the court shall presume that the parties' intent resides in the language of the agreement, and the court shall apply the terms, not interpret them. *See Foster Wheeler Enviresponse, Inc.,* 78 Ohio St.3d at 361, 678 N.E.2d at 526; *Kelly v. Medical Life Ins. Co.,* 31 Ohio St.3d 130, 131, 509 N.E.2d 411 (1987); *GenCorp, Inc.,* 178 F.3d at 817–18 (*citing Timber Ridge Inv., Ltd. v. Marcus,* 107 Ohio App.3d 174, 175, 667 N.E.2d 1283, 1285 (1995)).

Generally, the interpretation of a written agreement is a matter of law for the court. *See Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 73 Ohio St.3d 107, 108, 652 N.E.2d 684, 686 (1995). Only if the court determines that a contract term is ambiguous does a question of fact arise for the jury. *See GenCorp, Inc.,* 178 F.3d at 818 (interpreting Ohio law). Finally, writings that are a part of the same transaction shall be read as a whole, and the intent of each section shall be ascertained from a consideration of the whole. *Foster Wheeler Enviresponse, Inc.,* 78 Ohio St.3d at 361, 678 N.E.2d at 526.

This Court finds that the language contained in both the guaranty and the lease is clear and unambiguous.[4] As such, there is no question of fact for the jury; the Court can interpret the terms of the relevant agreements as a matter of law. The express terms of the guaranty clearly indicate that the Dabishes agreed to be personally liable for all damages that arose from ESB's breach of the lease and neither the settlement agreement or the termination of the lease limited that liability in any way.

### 1. Liability is Not Capped by the Amount of the Settlement Agreement

The Dabishes concede that, under the terms of the guaranty, they are liable for $174,061.56, the amount ESB agreed to pay New Market under the terms of the settlement agreement. However, the Dabishes contend that their liability as guarantors is limited to that amount. To support this assertion, the Dabishes cite to *Gholson v. Savin,* 137 Ohio St. 551, 31 N.E.2d 858 (1941).

In that case, Gholson leased certain property to Savin. Savin then assigned his rights under the lease to Garber. As a result, Garber, the assignee, assumed the position of principal obligor for the performance of the covenants of the lease, and Savin, the original lessee, became the surety of performance.[5] *Id.* at 557, 31 N.E.2d

---

4. The Dabishes correctly point out that "if a contract is ambiguous so that it may either extend or limit a guarantor's obligation, such contract should be construed to limit the obligation." *Yearling Properties, Inc. v. Tedder,* 53 Ohio App.3d 52, 54, 557 N.E.2d 1231, 1233 (1988). However, since the Court finds that the language of the guaranty is clear and unambiguous, the Dabishes' citation to *Yearling* is inapplicable.

5. The court in *Gholson* was discussing the obligations of a surety. The Dabishes, on the other hand, are guarantors. While the terms "surety" and "guarantor" are similar, they do have differences. Both a surety and

at 862. Thus, Savin's legal status as surety arose by operation of law; there was no express contract designating him as surety.

Garber failed to pay rent, and Gholson obtained judgments for the entire amount due under the lease against both Savin and Garber. Gholson and Garber then settled their dispute and, although they settled for an amount slightly less than the sum due under the judgment, it was acknowledged as a full satisfaction of the judgment against Garber. The settlement agreement between Gholson and Garber expressly reserved Gholson's right to enforce his judgment against Savin.

However, when Gholson later sought to recover from Savin, the court found this attempted reservation of right to be ineffectual. The court held that when a creditor makes an absolute settlement with the principal debtor, completely discharging him, the liability of the secondary debtor is likewise discharged. The creditor's reservation, in a release, of his right to enforce his claim against the surety was ineffectual because the surety's right to seek reimbursement from the principal debtor was extinguished by the creditor's complete discharge of the principal debtor's obligations. *Id.* at 556, 31 N.E.2d at 861. Therefore, in order for the creditor's reservation of the right to enforce the claim against the surety to be effectual, the release must be a "covenant not to sue" the principal debtor, rather than a "discharge" of the principal debtor.

Furthermore, the covenant not to sue must not only expressly reserve the creditor's right to enforce the claim against the surety, but must also expressly reserve the right of the surety to seek indemnification from the principal debtor. Without this notice that the surety has retained a right of reimbursement against him, the principal debtor would likely believe that the settlement agreement completely discharged all liability for the debt. *Id.* at 560, 31 N.E.2d at 863. The creditor may seek payment from the surety, and the surety may seek reimbursement from the principal debtor, only if these conditions are met.

In applying the holding in *Gholson* to the facts of this case, the Dabishes correctly point out that the settlement agreement that released ESB from further liability purported to be a complete discharge of ESB's obligations rather than a covenant not to sue. Thus, the Dabishes argue that because the settlement agreement completely discharged ESB's liability, their liability as guarantors was also completely discharged.[6] This would be true if not for the clear and unambiguous language of the guaranty that shows that the Dabishes expressly agreed to remain liable for all damages even if New Market released ESB from any further obligations. The express terms of the guaranty are controlling in this instance, and the common law rules that govern guaranty relationships implied by law, as set forth in *Gholson*, are inapplicable.

The Dabishes recognize that, in *Gholson*, the suretyship was implied by law, while the guaranty relationship in this case

---

guarantor are liable for the debt of another, but while a surety is usually bound with the principal debtor by the same instrument, a guarantor's contract is generally a separate undertaking. In addition, while a surety is automatically primarily liable for the debt, a guarantor's liability is usually contingent on the default of the principal debtor. *Black's Law Dictionary*, 1005 (6th ed.1991). These

subtle distinctions, however, are irrelevant in determining the issues in this case.

6. The impact of *Gholson* on the parties' failure to expressly reserve, in the settlement agreement, the right of the Dabishes to seek indemnification from ESB will be discussed in connection with ESB's motion for summary judgment.

was created by the express terms of the guaranty and lease. In an attempt to avoid the consequences of this distinction, the Dabishes quote the following language from *Gholson:* "[t]here is no distinction between a suretyship created with the consent of the creditor and that which arises by operation of law." *Id.* at 557, 31 N.E.2d at 862. The Dabishes interpret this language to mean that in all guaranty relationships, whether implied by law or created by express contract, a discharge of the principal debtor also discharges the secondary debtor. If this were true, the holding in *Gholson* would dictate that the discharge of the principal debtor, ESB, also functioned as a discharge of the guarantors, the Dabishes. However, this is an erroneous application of the court's language. When read in context, the court's statement in *Gholson* that "[t]here is no distinction between a suretyship created with the consent of the creditor and that which arises by operation of law" was intended to mean only that a guaranty relationship implied by law is equally enforceable and as legally binding as one created by contract.

Parties are always free to create special rights and obligations through contract that differ from the rights and obligations that would otherwise exist under the common law. That is what happened here. Even though at common law, as set forth by the court in *Gholson,* a complete discharge of ESB's liability would have operated as a complete discharge of the Dabishes' liability, the lessor and the Dabishes expressly agreed in the guaranty that the Dabishes' liability as guarantors would not be diminished by any settlement agreements or releases between the lessor and ESB. The express provisions of a guaranty trump the common law rules that govern guaranty relationships. *See Bank One, Akron v. Smart-*

*Tomlinson Corp.,* 56 Ohio App.3d 60, 61–62, 564 N.E.2d 1093, 1096 (1988).[7] In that case, as here, the principal debtor was released by the creditor via a settlement agreement. The creditor obtained judgment against the guarantor for payment on the note. The guarantor appealed the judgment, claiming that the release of the principal debtor also discharged the liability of the guarantor. The court held that:

> Generally, if a creditor executes a written release of the debt to the debtor, one who guarantees the payment of the debt is also released from his obligation as guarantor of the debt ... However, the contract entered into between [creditor] and [guarantor] provides ... "guarantor of this note ... assent[s] to any extension or postponement of the time of payment or any other indulgence, and/or to the addition or release of any other party or person primarily or secondarily liable." By the terms of the note which [guarantor] voluntarily signed, [guarantor] clearly assented to the release of [principal debtor]. Thus, the release of [principal debtor] does not affect the liability of [guarantor].

*Id.*

This Court finds that the express language of the guaranty clearly indicates that the parties intended for the Dabishes to remain liable for all damages, notwithstanding any discharge of ESB's liability. The pertinent paragraph of the guaranty reads:

> This Guaranty shall be a *continuing guaranty,* and the liability of Guarantor hereunder *shall in no way be affected, modified, or diminished* by reason of any assignment, renewal, modification, or extension of the Lease or by reason of any modification or waiver of or change in any of the terms, covenants, conditions, provisions, or agreements of

---

**7.** The Court finds the Dabishes' attempts to distinguish *Bank One, Akron,* inapposite.

said Lease, or by reason of any extension of time that may be granted by Landlord to Tenant, or by reason of any unilateral action of either Landlord or Tenant, *or by reason of* any dealings or transactions or matter or thing occurring between Landlord and Tenant, including, without limitation, any adjustments, compromises, *settlements,* accord and satisfactions, *or releases.*

(Ex. B to Dabishes' Mot. Partial Summ. J. ¶ 3)(emphasis added).

There is no language in the guaranty that limits the Dabishes' liability to the extent of ESB's liability.[8] In fact, the Dabishes expressly agreed to pay "all damages that may arise in consequence of any such default by Tenant." (*Id.* at ¶ 1). By agreeing to this language in the guaranty, the Dabishes affirmatively waived the protection otherwise afforded to them by *Gholson.* Had the Dabishes not agreed to a continuing guaranty that would not be affected by a settlement between ESB and New Market, *Gholson* would have precluded New Market from seeking payment from the Dabishes. However, in this case, the express provisions of the guaranty control.

### 2. Termination of the Lease Did Not Affect the Dabishes' Liability

▮ The Dabishes also claim that the settlement agreement terminated the lease, and while the guaranty is a continuing guaranty, it does not expressly provide for continuing liability after the lease is terminated. The Dabishes argue that "conspicuously absent" from the guaranty

is any mention of the effect of termination of the lease on their liability.

However, a closer reading of the guaranty, together with the lease, reveals that the parties did, in fact, intend for liability to continue even after the lease was terminated. While the guaranty itself does not expressly address this issue, it does provide the necessary link. The guaranty states: "Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished, or impaired *by reason of the assertion* or failure to assert, *by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease."* (Ex. B to Dabishes' Mot. Partial Summ. J. ¶ 2)(emphasis added). In turn, in the event of a default, one of the remedies available to New Market was termination of the lease. (Ex. A to Dabishes' Mot. Partial Summ. J. ¶ 17.2(d)).

The Court finds that the guaranty, read together with the remedies provision of the lease, clearly and unambiguously shows that the parties intended that the Dabishes' liability would continue even if the underlying lease was terminated. Therefore, the provisions of the settlement agreement which terminated the lease had no effect on the Dabishes' obligations.

### 3. Dabishes Agreed to Be Primarily Liable for Direct and Consequential Damages

The Dabishes point out that many of the damages sought by New Market were for

---

**8.** The Dabishes argue that, in the settlement agreement, New Market and ESB materially altered the Dabishes' original obligations, by imposing on them a liability "above and beyond" that of ESB. According to the Dabishes, since this material alteration was made without their consent, they should be discharged from all liability under the guaranty. The Court finds no merit in this argument.

In the lease, ESB agreed to be liable for all rent and for all direct and consequential damages arising from any default on the lease. In the guaranty, the Dabishes agreed to be liable for the same. Although the settlement agreement discharged ESB's obligations, it did not in any way materially alter the original obligations of the Dabishes as set forth in the guaranty.

expenses incurred from May of 1999 through March of 2000, after ESB and New Market had executed the settlement agreement, and after ESB had vacated the premises, thereby terminating the lease. Under Ohio law, the liability of an absolute guarantor exists only after default by the primary debtor. *See Eden Realty Co. v. Weather–Seal Inc.*, 102 Ohio App. 219, 222, 142 N.E.2d 541, 544 (1957). Therefore, the Dabishes contend that since New Market did not first seek payment from ESB for damages which accrued after the lease was terminated, ESB did not, and indeed could not, "default," so the Dabishes cannot be held liable for any expenses incurred after the lease was terminated.

 This argument fails for two reasons. Under Ohio law, once there has been a default, the creditor need not proceed against the principal debtor before pursuing the guarantor who has given an absolute guaranty. *See Eden Realty Co.*, 102 Ohio App. at 222, 142 N.E.2d at 544. By the express terms of the guaranty, the Dabishes agreed to be primarily liable for all of ESB's obligations under the lease. The guaranty was "an absolute and unconditional" guaranty of payment and of performance, enforceable by New Market either in a joint action against the Dabishes and ESB, or in a separate and independent action against the Dabishes.[9] *See* Ex. B to Dabishes' Mot. Partial Summ. J. at ¶ 2. The guaranty clearly gave New Market the option of seeking damages from the Dabishes without first pursuing ESB. In addition, ESB "defaulted" in August of

1997, when it first failed to pay its rent in a timely manner. This alone triggered the Dabishes' liability and obligated them to complete the full and prompt performance of all provisions of the lease, including ESB's obligation to pay New Market for all direct and consequential damages sustained as a result of the default. *See* Ex. A to Dabishes' Mot. Partial Summ. J. ¶ 17.4.[10] No further "default" was necessary.

In summary, the Court finds that the express terms of the guaranty clearly and unambiguously impose liability on the Dabishes. Neither the settlement agreement, the termination of the lease, or the "inability" of ESB to default on the damages accruing after the termination of the lease, in any way diminish the scope of the Dabishes' liability under the terms of the guaranty, which was triggered in August of 1997. There is no genuine issue as to any material fact concerning the Dabishes' liability. Therefore, New Market is entitled to partial summary judgment on the issue of the Dabishes' liability. It follows that the Dabishes' motion for partial summary judgment is denied.

**B. Enforceability of Attorneys' Fee Provisions**

██ As part of the settlement agreement, New Market specifically released ESB from liability for attorneys' fees, but New Market now seeks to recover attorneys' fees from the Dabishes. Both the lease and the guaranty contain provisions requiring the lessee and guarantor to pay for reasonable attorneys' fees in the event of a default on the lease.[11] It is unclear

---

9. The Dabishes argue that since the language in the first paragraph of the guaranty is more restrictive than the "absolute and unconditional" language in the second paragraph, the Court should ignore the broader language. However, the Court finds that the language in the first paragraph is no more restrictive; it also alludes to the guarantor being liable for all rent and for "all damages that may arise in consequence of any such default."

10. The Dabishes also agreed in the guaranty to "pay to Landlord all damages that may arise in consequence of any such default by Tenant under said Lease." *See* Ex. B to Dabishes' Mot. Partial Summ. J. ¶ 1.

11. Article 17.4 of the lease states, "... Tenant nevertheless shall remain liable for ... all reasonable costs, fees and expenses, including, but not limited to, leasing fees, attorneys'

whether New Market's assertion of this right stems directly from the Dabishes' obligations under the guaranty, or grows out of the provision in the lease by which ESB agreed to be liable for attorneys' fees incurred as a result of a breach. In either case, the Court finds that New Market may recover reasonable attorneys' fees from the Dabishes.

As to the lease, the Dabishes argue that, under Ohio law, attorneys' fee provisions in commercial leases are unenforceable since they are contrary to public policy. To support this assertion, the Dabishes cite extensively to *Miller v. Kyle*, 85 Ohio St. 186, 97 N.E. 372 (1911). In *Miller*, which involved a commercial transaction, the Ohio Supreme Court ruled that contracts for the payment of attorneys' fees upon default in payment of a debt would not be enforced, and were "denounced as contrary to public policy." *Id.* at 192, 97 N.E. at 372–73. New Market claims that *Miller* is outdated and its holding has been eroded by subsequent cases. New Market cites several more recent cases in which Ohio courts have held that Ohio law now recognizes and enforces attorneys' fees provisions in commercial leases.[12]

The Court notes that, as to the lease, a recently enacted statute supersedes the holdings in all of these cases. On May 11, 2000, the Ohio General Assembly passed a bill concerning enforcement of commit-ments to pay attorneys' fees; this new bill is controlling in this case. Ohio Revised Code § 1301.21 reads:

(A) As used in this section:

1. "Contract of indebtedness" means a note, bond, mortgage, conditional sale contract, retail installment contract, *lease*, security agreement, or other written evidence of indebtedness, other than indebtedness incurred for purposes that are primarily personal, family, or household.

2. "Commitment to pay attorneys' fees" means an obligation to pay attorneys' fees that arises in connection with the enforcement of a contract of indebtedness.

3. "Maturity of the debt" includes maturity upon default or otherwise.

(B) If a contract of indebtedness includes a commitment to pay attorney's fees, and if the contract is enforced through judicial proceedings or otherwise after maturity of the debt, a person that has the right to recover attorneys' fees under the commitment, at the option of that person, *may recover attorneys' fees in accordance with the commitment*, to the extent that the commitment is enforceable under divisions (C) and (D) of this section.

fees, renovation costs and any other expenses incurred by Landlord in pursuit of its remedies hereunder." The first paragraph of the guaranty states, "Guarantor ... will forthwith pay to Landlord all damages that may arise in consequence of any such default by Tenant under said Lease, including, without limitation, all reasonable attorneys' fees and disbursements incurred by Landlord or caused by any such default and/or by the enforcement of this Guaranty."

12. *See Nottingdale Homeowners' Ass'n, Inc. v. Darby*, 33 Ohio St.3d 32, 514 N.E.2d 702 (1987) (upholding an attorneys' fee provision in a condominium foreclosure case); *see also First Capital Corp. v. G & J Indus., Inc.*, 131 Ohio App.3d 106, 721 N.E.2d 1084 (1999) (upholding an attorneys' fee provision in accounts receivable finance agreement if parties have equal bargaining power, similar sophistication, and an opportunity to obtain counsel); *Goldfarb v. The Robb Report, Inc.*, 101 Ohio App.3d 134, 655 N.E.2d 211 (1995) (upholding an attorneys' fee provision in a franchise agreement); *Gaul v. Olympia Fitness Ctr., Inc.*, 88 Ohio App.3d 310, 623 N.E.2d 1281 (1993) (upholding an attorneys' fee provision in a commercial foreclosure action).

(C) A commitment to pay attorneys' fees is enforceable under this section only if the total amount owed on the contract of indebtedness at the time the contract was entered into exceeds one hundred thousand dollars.

(D) A commitment to pay attorneys' fees is enforceable under this section only to the extent it obligates payment of a reasonable amount.

Ohio Rev.Code Ann. § 1301.21 (Anderson 2000)(emphasis added).

Uncodified section 3 of 1999 H. 292, the applicable bill, states: "Section 1301.21 of the Revised Code applies only to commitments to pay attorneys' fees that are included in contracts of indebtedness that are *enforced, through judicial proceedings* or otherwise, on and after the effective date of this act." H.R. 292, 123 rd Leg. (Ohio 2000). The effective date of the bill was May 11, 2000. This Court finds the operational definition of the phrase "enforced, through judicial proceedings" to be the day judgment is rendered by the Court. Thus, this statute is applicable in this instance, as judgment will be rendered after May 11, 2000.

This Court finds that the lease in this case is a contract of indebtedness that includes a commitment to pay attorneys' fees, and that it is being enforced through judicial proceedings after its maturity. Furthermore, the lease satisfies the requirements of section (C), as the amount due under the lease at the time it was entered into by the parties was well over the required one hundred thousand dollars. (Ex. A to Dabishes' Mot. Partial Summ. J. ¶ 5.1). Thus, the attorneys' fees provision in the lease would have been enforceable against ESB pursuant to Ohio Revised Code § 1301.21. Since the provision was enforceable against ESB, it would also be enforceable against the Dabishes, who agreed to be liable for all of ESB's obligations under the lease.

 Even if the statute should be construed as not including a guaranty within its definition of a "contract of indebtedness," and hence not applicable to this case, the Court would still conclude that under more current case law, the provision for payment of attorneys' fees in a guaranty agreement is an enforceable obligation. It is true that the Ohio Supreme Court has never explicitly overruled *Miller*. However, in 1996, Judge Walter Rice noted that "[t]he continuing vitality of *Miller* is uncertain, however, in light of the recent case of *Nottingdale Homeowners' Association, Inc. v. Darby*, 33 Ohio St.3d 32, 514 N.E.2d 702 (1987)." *See RB–3 Associates v. M.A. Bruder & Sons, Inc.*, No. C–3–95–198, 1996 WL 1609231 at *3 (S.D.Ohio Aug. 26, 1996). In *Nottingdale*, a non-commercial foreclosure action, a condominium owners' association sought to enforce an attorneys' fee provision. Citing the fundamental right to freely contract, the Court upheld the validity of the provision, noting that "[a] rule of law which prevents parties from agreeing to pay the other's attorney fees ... is outmoded, unjustified, and paternalistic." 33 Ohio St.3d at 37, 514 N.E.2d at 706–07.

However, in *Nottingdale*, the Ohio Supreme Court distinguished *Miller*, noting that while *Miller* dealt with a commercial transaction, *Nottingdale* involved "a specific contractual provision that was assented to in a non-commercial setting by competent parties with equal bargaining positions and under neither compulsion nor distress." *Id.* at 35, 514 N.E.2d at 705. In *RB–3 Associates*, Judge Rice rejected the implication that, after *Nottingdale*, attorneys' fee provisions in commercial settings are unenforceable, but the same provisions in a non-commercial setting are valid. 1996 WL 1609231 at *4. He noted

that parties in a commercial setting are much more likely to have equal bargaining power than their non-commercial counterparts. *Id.* Therefore, he interpreted the distinction made in *Nottingdale* to be based not on a commercial vs. non-commercial setting, but on whether the parties had equal bargaining power. *Id.* at *5. Judge Rice further noted that "cases decided by intermediate appellate courts after *Nottingdale* ... have not agreed upon either the effect of *Nottingdale* or the continued viability of *Miller.* However, the weight of authority appears to support the enforceability of such provisions, particularly where there is equal bargaining power between the parties." *Id.* at *6 (citing numerous cases).

This Court agrees with Judge Rice, that where the parties have equal bargaining power and are represented by counsel, freedom of contract weighs in favor of enforcing attorneys' fee provisions in both commercial and non-commercial settings. In this case, both New Market and the Dabishes were represented by counsel. Furthermore, the Dabishes, as partial owners of a large chain of health clubs, cannot be said to be unsophisticated in business matters or to have unequal bargaining power. There is no evidence that they signed the guaranty under duress. Furthermore, even though Ohio Revised Code § 1301.21 does not specifically include guarantees, it is certainly evidence of a trend in Ohio toward enforcing attorneys' fee provisions in commercial settings. In this Court's view, the attorneys' fee provision in the guaranty, like that in the lease, is fully enforceable against the Dabishes. New Market may therefore recover reasonable attorneys' fees from the Dabishes.

## C. The Dabishes' Right Of Indemnity Against ESB

As noted earlier, ESB and the Dabishes were both named as defendants in this action, but in accordance with the terms of the settlement agreement, New Market later dismissed its claims against ESB. After the Dabishes removed this action from state court, they filed a third-party complaint against ESB. ESB now seeks summary judgment on two grounds. First, ESB argues that it is not a proper party to this action because no right of contribution or indemnity has yet accrued. Second, ESB argues that it has already reached a full and final settlement with New Market and compelling it to now indemnify the Dabishes would essentially vitiate the settlement agreement. ESB therefore contends that the Dabishes have no express or implied right to seek indemnification.

In support of its claim that it is not a proper party to this action, ESB cites to Ohio cases which have held that a right of contribution or indemnity does not accrue until after one party has paid more than its fair share.[13] ESB argues that since the Dabishes have not yet paid any money to New Market, no cause of action for indemnification has accrued, and ESB should, therefore, be dismissed from this suit. ESB contends that, in the event the Dabishes are found liable and do pay money to New Market, the Dabishes can then file a separate suit for indemnification.

In the Court's view, the issue of whether ESB is a proper party to this action is

13. *See Camp v. Bostwick,* 20 Ohio St. 337 (1870); *see also Jones v. Berkley,* 12 Ohio Supp. 82 (1942); *Nationwide Mut. Ins. Co. v. Marcinko,* 436 N.E.2d 551, 556 (1980); *Midwest Specialties v. Crown Indus. Prods. Co.,* 940 F.Supp. 1160, 1168 (N.D.Ohio 1996)(noting that right to indemnity and/or contribution accrues only after claimant has satisfied the obligation).

governed by Fed.R.Civ.P. 14(a), which reads in relevant part:

At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is *or may be liable* to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff. (emphasis added).

The idea is that a party, who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff, is retained as a party to the action while the underlying determination of liability is decided. If it is determined that the third-party plaintiff is liable to the plaintiff, the only question remaining is whether the third-party defendant is in fact liable to the third-party plaintiff for all or part of the plaintiff's claim.

"The objective of Rule 14 is to avoid the situation that arises when a defendant has been held liable to plaintiff and then finds it necessary to bring a separate action against a third individual who may be liable to defendant for all or part of plaintiff's original claim." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1442 (2d ed.1990). Rule 14 is designed to "encourage judicial economy by permitting courts to dispose of multiple claims which arise out of the same set of facts." *Tate v. Frey,* 735 F.2d 986, 989 (6th Cir.1984). "Since the rule is designed to reduce multiplicity of litigation, it is construed liberally in favor of allowing impleader." *Federal Deposit Ins. Corp. v. Loube,* 134 F.R.D. 270, 272 (N.D.Cal.1991).

Whether the third-party plaintiff has, or may have, a right to relief against the third-party defendant is based upon the applicable state's substantive law. *See Tate,* 735 F.2d at 989. The third-party plaintiff is not required to prove that the third-party defendant would absolutely become liable to the third-party plaintiff if it loses the underlying lawsuit. The third-party plaintiff must only prove that "there is some possible scenario" under the applicable state's substantive law where the third-party defendant may be liable for all or part of the plaintiff's claim against the third-party plaintiff. *See Federal Deposit Ins. Corp.,* 134 F.R.D. at 272.[14] The central question then becomes whether, under Ohio law, there is any possible scenario by which ESB would have to indemnify the Dabishes for any damages the Dabishes must pay to New Market.

It is undisputed that there is no express indemnity agreement between ESB and the Dabishes, either written or oral. However, whether the Dabishes have an implied right of indemnity against ESB is a more complicated matter. Absent the existence of the settlement agreement between New Market and ESB, it is clear that the Dabishes would have an implied right of indemnity. In Ohio, "the law implies an obligation of a principal debtor to reimburse his guarantor for any amount that the guarantor is required to pay on the guaranteed indebtedness." *Mutual Fin. Co. v. Politzer,* 21 Ohio St.2d

---

**14.** This includes the situation where the third-party plaintiff's cause of action against the third-party defendant has not yet accrued. *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Federal Deposit Ins. Corp.,* 887 F.Supp. 262, 264 (D.Kan.1995). A defendant may implead a party, even though a cause of action has not yet accrued, provided the claim is contingent upon the success of plaintiff's claim, and will accrue when defendant is found liable in the main action. "The fact that defendant is not yet 'out of pocket' is not fatal to his third-party complaint." *See Community Fed. Sav. & Loan Ass'n v. Transamerica Ins. Co.,* 559 F.Supp. 536, 537 (E.D.Mo.1983).

177, 183, 256 N.E.2d 606, 610 (1970); *Richards Elec. Supply Co. v. First Nat'l Bank of Harrison,* 2 Ohio App.3d 325, 327, 441 N.E.2d 1130, 1133 (Ohio Ct.App.1981).

■ However, because New Market discharged its debt against ESB in the settlement agreement, the holding in *Gholson* is applicable and abolishes any implied right of indemnity that the Dabishes may have had. As noted earlier, *Gholson* held that, when a creditor releases the principal debtor from all further obligations, a creditor's reservation of right to enforce its claim against a surety or guarantor is effectual only if: (1) the release is a covenant not to sue the principal debtor, rather than a discharge of the principal debtor; and (2) the release expressly reserves the creditor's right of enforcement against the surety or guarantor. The Ohio Supreme Court further found that even if these two conditions are met, it would be unfair to allow the surety or guarantor to seek indemnification from the principal debtor unless the release expressly reserves the right of the surety or guarantor to do so. 137 Ohio St. at 560, 31 N.E.2d at 863. Without this notice, the principal debtor is justified in believing that since he has fully settled his debt with his creditor, he is no longer liable to *anyone* for that debt.

As the Court explained above, the express terms of the guaranty trumped the holding in *Gholson* as to the relationship between New Market and the Dabishes. Therefore the Dabishes remained liable for all damages arising from ESB's default on the lease. However, in the absence of an express indemnity contract between ESB and the Dabishes, the common law, as set forth in *Gholson,* governs the relationship between them. Under *Gholson,* Dabishes' implied right of indemnity evaporates because not only was the release drafted as a full discharge of ESB's obligations rather than a covenant not to sue, but in addition, the settlement agreement failed to expressly reserve the Dabishes' right to seek indemnification from ESB.

The Court is somewhat troubled by the fact that the Dabishes were not a party to the settlement agreement and therefore had no opportunity to insert language that would have protected their right of indemnity. However, the guaranty clearly contemplates that New Market and ESB could unilaterally enter into "compromises, settlements, accord and satisfactions, or releases ... whether or not notice thereof is given to Guarantor, all of which notices Guarantor expressly waives." (Ex. B to Dabishes' Mot. Partial Summ. J. at ¶ 3). As noted earlier, William Dabish was represented by counsel and had the opportunity to read the guaranty. If the terms of the guaranty were unacceptable, he was under no obligation to sign it. He essentially waived his right to participate in negotiations concerning the settlement agreement between New Market and ESB and cannot now complain about the unfair outcome.

In summary, the Court finds that the Dabishes have no express right to seek indemnification from ESB. Although an implied right of indemnification existed, pursuant to *Gholson* that right was abolished when New Market and ESB executed the settlement agreement which completely discharged ESB's obligations and failed to reserve the right of the Dabishes to seek indemnification from ESB. The Court finds that there are no genuine issues of material fact concerning the Dabishes' right to seek indemnification from ESB. ESB is not liable to the Dabishes for indemnification, and ESB is therefore not a proper party to this action and is entitled to summary judgment as a matter of law.

The conclusion is that the guarantors are liable to the lessor for damages incurred by the lessee's breach of the lease agreement, but the guarantors have no

right to be indemnified by the lessee—a conclusion that may appear to be harsh from the guarantors' perspective. If so, it must be remembered that it is the result of the guarantors' own willingness to enter into a guaranty agreement that clearly and unambiguously imposed that liability on them and their failure to require the lessee to enter into an indemnification agreement that would expressly set forth their right of indemnification and thus prevent *Gholson* from restricting those rights in the event of a settlement between the lessee and the lessor. In short, if the guarantors desired to limit their liability and to provide for indemnification, they should have insisted upon a guaranty agreement and indemnification agreement that gave them those rights.

## IV. Conclusion

The Court finds that, according to the clear and unambiguous terms of the guaranty, the Dabishes are liable for all damages arising from ESB's breach of its commercial lease with New Market. The Court also finds that the attorneys' fees provisions in the lease and guaranty are fully enforceable by New Market. Therefore, Plaintiff's Motion for Partial Summary Judgment (Record at 54) is **GRANTED**, and Defendants' Motion for Partial Summary Judgment (Record at 48) is **DENIED**. The Court finds that, under the Ohio Supreme Court's holding in *Gholson*, ESB no longer has any obligation to indemnify the Dabishes. Accordingly, ESB is not a proper party to this action and the Motion of Third Party Defendant ESB One Berger Enterprises, Inc. for Summary Judgment (Record at 47) is **GRANTED**.

In light of the Court's ruling, the Court **VACATES** the dates previously set for the Final Pretrial Conference, Conference Prior to Trial, and the Trial. The Court will hold a **STATUS CONFERENCE** with regard to further proceedings in this case on Wednesday, May 16, 2001 at 10:00 a.m.

**IT IS SO ORDERED.**